IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

BILLY JEAN NAYLOR, JR.,

      Plaintiff,

v.                                CASE NO. 2:09-cv-0308

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are briefs in support of judgment on the pleadings.

Plaintiff, Billy Jean Naylor, Jr. (hereinafter referred to as "Claimant"), filed an application for SSI on February 16, 2005, alleging disability as of October 22, 1982, his birth date, due to "a nervous condition and mental retardation". (Tr. at 15, 36, 49-51, 52-55.)  The claim was denied initially and upon reconsideration. (Tr. at 15, 36-38, 40-42, 43-45.)  On February

22, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 35.) The hearings were held on October 26, 2006 and December 11, 2006 before the Honorable John Murdock. (Tr. at 28, 639-59, 660-701.) By decision dated March 20, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-25.) The ALJ's decision became the final decision of the Commissioner on January 27, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 4-7.) On March 26, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If

2

the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in

substantial gainful activity since the alleged onset date. (Tr. at 17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of learning disability and personality disorder. (Tr. at 17-19.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19-20.)  The ALJ then found that Claimant has a residual functional capacity for work at any exertional level, reduced by nonexertional limitations. (Tr. at 20-23.)  Claimant was found to have no past relevant work. (Tr. at 24.)  The ALJ concluded that Claimant could perform jobs such as industrial cleaner and groundskeeper which exist in significant numbers in the national economy. (Tr. at 24-25.)  On this basis, benefits were denied. (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

4

Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 24 years old at the time of the administrative hearing.  (Tr. at 642.)  He has an eleventh grade education.  (Tr. at 642.)  He received special education courses throughout his education.  (Tr. at 643.)  In the past, he worked in a youth program for a very limited time doing gardening work and carrying boxes for a food program.  (Tr. at 644, 670.)  He also worked very briefly (six days) for a temporary job placement service doing janitorial work.  (Tr. at 643-44, 671.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Evidence</u>

On August 12, 1985, December 16, 1985, April 11, 1986, April 31, 1986, March 1, 1989, November 6, 1989, and April 4, 1990,

5

Claimant underwent audiological evaluations at Charleston Area Medical Center ("CAMC"). (Tr. at 191-98.)  A note dated March 1, 1989 stated that Claimant had delayed speech development. (Tr. at 193.) On November 6, 1989, the examiner found Claimant's "hearing is within normal limits at 250-8K Hz, bilaterally." (Tr. at 192.) An audiological evaluation dated August 12, 1985, noted Claimant was uncooperative and that results were questionable due to "child's highly excited state (i.e. crying and excessive movement." (Tr. at 198.) Notes dated April 4, 1990 noted that Claimant had problems with hyperactivity. (Tr. at 191.)

On March 16, 1989, Muhib S. Tarakji, M.D. reported that Claimant's "visual acuity was 20/25 in the right eye and 20/-30 in the left eye, although this was questionable... Motility examination showed no evidence of esotropia or exotropia and his rotations were perfectly normal.  Depth perception testing was normal.  Slit lamp and fundus examination were normal." (Tr. at 190.)  Dr. Tarakji found Claimant to have very mild hyperopia (farsightedness) and no evidence of amblyopia (lazy eye). (Tr. at 190.)

Records indicate that Claimant was treated by Isidro Uy, M.D. from October 2, 1989 to May 22, 1998 for general medical issues. Although the handwritten notes are largely illegible, it is clear that Claimant was immunized and treated for a variety of family care-type ailments, including medication refills, acne, cold

6

symptoms, sinus problems, various aches and pains. (Tr. at 223-45.)
Also, included in the records are electroencephalograms dated
October 10, 1989, January 15, 1991 and May 13, 1992 showing
claimant's sedated sleep record, as well as his waking and
hyperventilation record with some light sleep, to be "within normal
limits." (Tr. at 246, 248, 249.)   Also, a right knee x-ray dated
January 24, 1992, shows no bone or joint abnormality.   (Tr. at
247.)

On May 21, 1999, Claimant was admitted to CAMC emergency
department following an altercation.   (Tr. at 253-54.) X-rays
indicate that Claimant was "struck on head with fist... The facial
bones appear to be normal without evidence of fracture or other
abnormality.   The visualized sinuses appear clear.   IMPRESSION:
Normal facial bones." (Tr. at 255.)

On January 19, 2001, Julie DeTemple, M.D., and Jeffrey V.
Ashley, M.D., of Family Medical Center of Charleston, wrote a "To
Whom It May Concern" letter at the request of Claimant.   (Tr. at
256.)   Attached records show Claimant was examined, given a
complete check up and blood work, on January 2, 2001. (Tr. at 257-
59.)   Claimant's complaints were "bad nerves...coughing and
sneezing."  (Tr. at 257.) The letter states:

> This patient is an 18-year-old white male who recently
> voluntarily dropped out of school in the 12th grade
> seeking life long disability related benefits under the
> social security act.  Patient requested that I write this
> letter in support of his claim.  Patient reports that he
> wants disability benefits because "I don't want to work".

7

Patient has been examined thoroughly and has no physical limitations.

(Tr. at 256.)

On February 26, 2001, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 282-89.) The evaluator, R. L. Go, M.D., cited the medical report of Dr. Julie DeTemple as a treating or examining source regarding Claimant's physical capacities that supported this conclusion. (Tr. at 288-89.) Dr. Go concluded Claimant did not have severe physical impairments: "His pains and symptoms are partially credible. He has nerves, memory problem, and MMR [mild mental retardation]. He can do a wide range of work-related activities." (Tr. at 287-89.)

On February 3, 2006, Claimant was evaluated at the Upper Kanawha Health Clinic for a "DHHR PE [Department of Health and Human Resources Physical Examination]". (Tr. at 612-14.) The form indicates that Claimant has responded affirmatively to the following questions:  trouble with hearing, trouble with eyes, shortness of breath, coughing, smoking, wheezing, drinking occasional beer, feeling depressed or nervous. (Tr. at 613-14.)

Psychiatric Evidence

On July 23, 1990, LaRee D. Naviaux, Ph. D., licensed psychologist, social worker, and counselor, wrote to Isidro Uy, M.D., thanking him for his referral of the then seven-year-old

8

Claimant.  She stated that Claimant was "seen only once on December 12, 1989."  (Tr. at 209.)  She stated:

> The Wide Range Achievement Test-Revised and part of the Kaufman Assessment Battery were administered to him with the Hyperkinesis Index and Yale Inventory being given to his father.  The results were really varied.  On the WRAT-R he was achieving at a Pre-First grade level on Reading, Spelling, and Arithmetic with standard scores of 67, 70, and 50 respectively.  The respective percentiles were 1, 2, and a .07.

> Lack of time resulted in the KABC being incomplete.  What was done is presented on the enclosure.  His abilities ranged from Below Average to Well Above Average.  It appears that he might have a serious visual-motor coordination and integration problem.  He was quite distractible, rocked on the chair, was not alert to directions on some tasks, and verbally reversed the order on another task.

> On the Index his father had a score of 25 with 80 on the Yale Inventory.  These indicate a high level of distractibility and hyperactivity.

> A very perplexing child, indeed.  The enclosed letter was sent to his parents in hopes that they will return so that a complete evaluation can be done of him.

(Tr. at 209.)

Dr. Naviaux's enclosed Kaufman Assessment Battery for Children reveals: On Global Scales, Sequential Processing, Claimant's age equivalent was 9 years, 1 month; On Mental Processing Scales, Sequential Processing, Hand Movements, his age equivalent was 8 years, 3 months; On Number Recall, his age equivalent was 12 years, 6 months+; On Word Order, his age equivalent was 6 years, 6 months; On Gestalt Closure, his age equivalent was 5 years, 9 months; On Triangles, his age equivalent was 12 years, 0 months; On Matrix

9

Analogies, his age equivalent was 6 years, 6 months; On Spatial Memory, his age equivalent was 5 years, 6 months. (Tr. at 211.)

On October 23, 1990, Ruth W. Burdette, M.A., a Kanawha County Schools psychologist, and Harold McMillian, M.A., a lead psychologist, Psychological Services, performed a psychological evaluation of Claimant, then an eight-year-old second grader. (Tr. at 199-202.) The evaluators noted that prior to testing, a telephone conference was held with Dr. LaRee Naviaux, Claimant's private psychologist, who "felt the Eligibility/IEP Committee should ask for a neurological examination." (Tr. at 199.) The evaluators noted that Claimant's "Attention and concentration were poor and many items had to be repeated. In general, this is not believed to be an accurate estimate of Billy's true ability level... On the administration of the WISC-R, Billy obtained a verbal IQ of 81 and a Performance IQ of 87. This results in a Full Scale IQ of 83 which falls in the Low Normal range of intellectual ability." (Tr. at 199-200.)

Claimant Behavior Evaluation Scale scores indicated he had a behavior quotient of 69, with 100 equaling an average quotient. (Tr. at 200.) On the Developmental Test of Visual-Motor Integration test, Claimant's results were the equivalent of 5 years, 7 months, indicating his visual-motor development was below average. (Tr. at 201.) On the Walker Problem Behavior Identification Checklist, Claimant's areas of significant weakness were withdrawal,

10

distractibility, disturbed peer relations, immaturity. (Tr. at 210.) On the Kinetic Family Drawing test, claimant was noted to be "immature...Billy acts very child-like. He wants adult assistance on many tasks. He appears to have no confidence in himself but wants his answer to be correct. Billy does not seem to respond to positive reinforcement. He just quietly does nothing approximately 95% of the time." (Tr. at 201.) The evaluators concluded that "Billy needs consequences for not doing any work. Time out or loss of playtime for example. A neurological may be helpful. Bill will argue with you. He needs to learn to accept authority." (Tr. at 202.)

On January 9, 1991, Dr. Naviaux wrote to Isidro P. Uy, M.D., stating that Braley & Thompson were providing in-home parenting and guidance to the Naylors and that there had been a marked improvement in the Naylors parenting skills. She also noted that Claimant's teacher had reported that Claimant was having what "appear[ed] to be petit mal seizures...Some days he can have as many as 5 an hour and some days none. The teacher has wondered if it might be related to what he has eaten... it would seem appropriate to have him both an asleep and awake EEG and possibly test for food allergies to clarify this situation." (Tr. at 208.)

On March 27, 1991, Claimant was admitted to Highland Hospital for the chief complaint of "severe behavioral problem." (Tr. at 205.) On the Admission Summary, Pablo M. Pauig, M.D.,

11

Psychiatrist, noted:

> This 8-year-old white male patient, intellectually
> limited and in special education, was admitted to
> Highland Hospital because of behavioral problem,
> especially in school and that he drams [sic, dreams]
> about ghosts and angels. He has been seen by Dr. Naviaux
> who recommended hospitalization. He has been on Ritalin
> in the past.
>
> When father called for admission, he described patient's
> behavior as being very defiant and likes to fight in
> school. Family history revealed both parents appeared to
> be psychiatrically impaired and intellectually limited.
>
> Reasons for hospital admission include failure of
> outpatient or extended care management, need for
> continuous skilled observation and skilled
> multidisciplinary therapeutic environment, and severely
> impaired personal, social, familial, and educational
> functioning...
>
> MENTAL STATUS EXAMINATION: Appearance is that of a fairly
> developed and nourished male whose behavior was
> cooperative. Orientation was commensurate with level of
> functioning. Speech revealed some speech problems.
> Stream of thought was coherent. There was no evidence of
> illusions, delusions, obsessions, or phobias. There was
> no evidence of hallucinations. Memory was commensurate
> with his level of functioning. Reality testing,
> attention and concentration were poor. Affect and mood
> were dull. Relationship to examiner was cooperative.
> Judgment was lacking. He denied suicidal or homicidal
> ideation. IQ level was moderate to mild retardation.
> Insight was lacking.
>
> ADMISSION DIAGNOSIS:
> Axis I    Adjustment Reaction of Childhood with
>           Disturbance in Emotions and Conduct.
> Axis II   Mild Mental Retardation.

(Tr. at 205-6.)

According to a discharge summary, Claimant was discharged from

Highland Hospital on April 5, 1991 when his father "decided to take

the patient home." (Tr. at 203.) Dr. Pauig noted that Claimant's

physical examination and urine examination were "essentially negative." (Tr. at 203.) He noted that Claimant

> was started on Vistaril 25 mg. shortly after admission because of behavioral difficulties. He was prescribed Vitamin C 250 mg. and Feosol 65 mg. daily by his family physician, and this was therefore, re-ordered. During his hospitalization, he was seen daily for supportive psychotherapy and participated in activities. However, it was noted that during his stay in the hospital, his behavior fluctuated. There were times when he was defiant, and had difficulties listening to the staff. It was also evident that the patient was intellectually limited, probably functioning on mild mental retardation level. There were times when the patient was enuretic although this was not mentioned prior to his admission. It should be interesting to note that when the father called for admission, he described patient having severe behavioral problems in school and at home; however, prior to his discharge his father stated that there have been no difficulties and he did not know why he was sent to the hospital. He therefore decided to take the patient home... Condition on discharge was very marginal improvement. The patient still exhibited behavioral difficulties... Prognosis is guarded.

 (Tr. at 203.)

On May 10, 1991, Dr. Naviaux wrote to Claimant's parents after they failed to keep an appointment. She stated:

> Since Brayley & Thompson provide regular in-home services and are aware of the issues at home and school, it seems unnecessary for me to be involved anymore. They also have a consultant who can work with you, the case aide, and Dr. Uy regarding his medications. It was a surprise to me to learn that you had chosen to remove Billy from Highland against medical advice. Just as surprising was the fact that in her work with him Debbie discovered that Billy was acting out seizure-like behavior in a manipulative manner... You have been a challenging family to work with and I am pleased that you're getting the services you need for Billy and yourselves. It is vital that Billy's behavior at home and school be monitored so that he can get a good start in life.

13

(Tr. at 207.)

On March 3, 1994, Madhy Chaturvedi, M.A., Ed.S., School Psychologist, performed a psychological evaluation of Claimant, then an eleven-year-old fifth grader.  (Tr. at 213-15.)   Dr. Chaturvedi opined:

> In general, this is believed to be an accurate estimate of Billy's ability level... On the administration of the WISC-3, Billy obtained a Verbal IQ of 67 and a Performance IQ of 80.  This results in a Full Scale IQ of 71 which falls in the Borderline range of intellectual ability... Overall, based on these results Billy can be expected to perform at a level which is considerably lower than same aged peers.

(Tr. at 213-14.)

On May 28, 1996, Rebecca S. Francis, School Psychologist, performed a psychological evaluation of Claimant, then an thirteen-year-old seventh grader.  (Tr. at 216-18.)  Ms. Francis opined:

> On administration of the WISC-III, the student obtained a Verbal IQ of 75 and a Performance IQ of 80.  This results in a Full Scale IQ of 76 which falls in the borderline range of intellectual ability.  This corresponds to the 5th percentile which indicated that intellectual functioning is equal to or better than 5% of individuals the same age... Billy's overall Adaptive Behavior Quotient of 79 falls below the average range... Billy's behavior falls below an average range on the following:  Inappropriate Behavior, Unhappiness/ Depression, and Physical Symptoms/Fears.  His overall Behavior Quotient falls into a range considered Poor...
>
> The results of evaluation suggest that the student would have considerable difficulty and very likely be unable to maintain average grades in school.  It is suggested that he be given as much individual help as possible.  It is also suggested that if the student is no longer eligible for special education assistance that he then be identified as an "at risk" student and be made eligible for vocational training.

14

(Tr. at 216-18.)

Treatment notes show Claimant was treated at Shawnee Hills Community Mental Health/Mental Retardation Center, Inc. from September 7, 1996 to June 4, 2001. (Tr. at 290-569.) On October 10, 1996, a report labeled "Psychosocial Assessment/Intake" states that Claimant is an eighth grade student being evaluated for attention deficit disorder (ADD). (Tr. at 554.) The report notes that Claimant was seen by Dr. Naviaux in elementary school, who felt that Claimant had ADD. (Tr. at 555.) Many of the handwritten notes are illegible, although a common notation is "problems in school with inability to focus attention, staying on task, inability to complete work and other ADHD symptoms." (Tr. at 503, 511, 516, 523, 526, 529, 532, 538.) The treatment plan for Claimant is stated as "to stabilize mood and behavior to allow for age appropriate development." (Tr. at 463, 468, 471.) Claimant is prescribed "Adderall 10 mg, 1 - 1 ½ in the morning" and this is noted in many "MedCheck" reports. (Tr. at 306, 309, 311, 326, 330, 332, 350, 389, 422, 424, 425, 449, 451, 453, 457, 466, 469, 501, 505, 507, 509, 515, 518, 527, 533.)

On November 18, 1996, Ted Vickers, PAB, of Shawnee Hills, Inc., provided a Comprehensive Psychiatric Evaluation of the then fourteen-year-old Claimant. (Tr. at 219-22.) Dr. Vickers states that Claimant was referred to him by his school because of "school problems...they feel he has difficulty focusing his attention,

15

staying on task, and completing his work.  He is disruptive in
class, intrusive, and bossy in the classroom." (Tr. at 219.) Dr.
Vickers stated:

> Father reports that both he and Billy's biological mother
> were special ed students.  Believes most recent test on
> the WISC reveals a Full Scale IQ of 76 in the Borderline
> range of intellectual ability.  The school has noted
> tangential remarks, bizarre behaviors, social withdrawal.
> Grades are OK in special education.  Father doesn't know
> why he is here.  The father is concerned that Billy is
> nervous and has given him "Nervine".  He states that
> Billy's hands shake when he gets upset, as also has been
> a problem with both of his parents.  The father has some
> unusual belief systems feeling he has psychic powers and
> telling his son that he has psychic powers.  Billy states
> he has an IQ of 180.  Billy states Dr. Naviaux told him
> he could be a genius if he could read better.  Billy,
> however, denies auditory or visual hallucinations,
> excessive sadness, crying spells, or hopelessness.  The
> father states he has religious visions.

(Tr. at 219.)

Dr. Vickers noted that claimant was in the eighth grade,
getting B's in special education classes, had never been held back
but had been suspended for fighting.  (Tr. at 221.) He consulted
with Dr. John Hutton who prescribed Paxil 10 mg and advised
Claimant to return in one month. (Tr. at 221-22.)   Dr. Vickers
summarized Claimant's Mental Status Exam:

> Billy presents as a casually kempt, slightly disheveled
> male who appears his stated age.  Eye contact is good.
> Attitude is one of cooperation.  He has no unusual tics
> or mannerisms.  Psychomotor activity is within the range
> of normal.  Posture and gestures are unremarkable.  Mood
> subjectively and objectively is euthymic.  Affect is
> broad and appropriate.  Thought processes are grossly
> intact with SOT spontaneous, coherent and goal directed
> and COT WNL [within normal limits].  He is oriented times
> person, place and time but not situation.  His attention

16

span is fair as is his memory.  He is able to do 4 digits forward and 2 in reverse.  General information fund is fairly good.   Abstract  reasoning  appears  concrete. Judgment and insight seem impaired.

DIAGNOSTIC IMPRESSION:
1) Adjustment disorder with mixed disturbance of emotions and conduct, 309.40
2) Borderline intellectual functioning
3) R/O ADHD
4) R/O Parent/child problems
5) R/O Conduct disorder

(Tr. at 221.)

On  March  1,  1999,  Ruth  W.  Burdette,  Ed.S.,  School Psychologist,  wrote  in  a  psychological  report  that  Claimant "entered  Capital  High  School  this  fall  as  a  behavior  disordered student.   He  seems  to  be  progressing  well  but  requires  constant supervision...  Recommendations:  Continue  eligibility  as  a  BD [behavior disorder] student.  Monitor carefully at all times.  Give reassurance  to  diminish  fears  and  increase  security."   (Tr.  at 250.)  Ms. Burdette indicated that Claimant was sixteen years old and in the tenth grade.  She attached BES-2 Scoring Results showing areas  of  concern  to  be  unhappiness/depression  and  physical symptoms/fears.  (Tr. at 250-51.)

On January 6, 2000, John Hutton, M.D., Shawnee Hills, Inc., Outpatient Clinic, stated in a Pharmacological Management report:

This  17  year  old,  11th  grade  student  at  Capitol  High School reports he's doing pretty well.  His English and history grades have dropped to low D's.  He has been taking his medicine regularly.  He presents somewhat inattentive, with good eye contact.  Rapport is easily established.  He's somewhat disheveled, less so than usual.  ADL's are accomplished with prompting.  Mood is

17

mildly irritable, affect constricted but appropriate. He's not suicidal or homicidal at this time. Sleep and appetite are good. Interpersonally he's somewhat passive aggressive but friendly and polite. Thoughts are grossly intact, with SOT and COT within normal limits. No evidence of auditory or visual hallucinations nor paranoia. Cognition is concrete as per I.Q. No evidence of drug or alcohol abuse. No AR/SE.

(Tr. at 293.)

On February 21, 2000, Dr. Hutton, M.D., Shawnee Hills, Inc.,

Outpatient Clinic, stated:

Billy is continuing to struggle academically. He has got 3 F's, although the rest of his grades are fairly good... He is working part of the day in a work/study program which he functions as a clerical aide checking in video or cassette tapes. He claims he is having trouble paying attention in school because he talks too much and the medicine makes him talk too much. His father reports the opposite observation and when he takes the medicine at home he can play video games and is more quiet. He has, in the past, been somewhat verbally oppositional. Mood is fairly good today. Rapport is easily established. Sleep and appetite are good.

(Tr. at 291.)

On February 5, 2001, Lisa C. Tate, M.A., a licensed psychologist, provided a Psychological Evaluation of Claimant for the West Virginia Disability Determination Service. (Tr. at 260-67.) Ms. Tate stated that Claimant was administered the WAIS-III. The results were 75 for Verbal IQ, 76 for Performance IQ, and a Full Scale IQ of 74. She indicted that the testing was considered to be valid and that it suggested that Claimant's intellectual functioning was within the level of borderline range. (Tr. at 264.) The WRAT-III testing results were also considered to be valid.

18

Claimant's reading and arithmetic levels were found to be a 5th grade equivalent and his spelling, a 2nd grade level. (Tr. at 265.) Ms. Tate found:

> OBSERVED FINDINGS: Mr. Naylor exhibits a euthymic mood and broad and reactive affect. Thought processes were logical and coherent during the interview. Immediate memory was within normal limits. Recent memory was moderately deficient. Remote memory was intact.
> DIAGNOSTIC IMPRESSION: (DSM-IV DIAGNOSIS):
> AXIS I:   315.39    Phonological disorder.
> AXIS II:  V62.89    Borderline intellectual functioning.
> AXIS III: By Self-Report: None.
> PROGNOSIS: Fair...
> Daily Activities:  Watching television and eating.
>
> Weekly Activities:  Going to the post office.
>
> Monthly Activities:  Taking a shower or bath every three weeks, going to the grocery store with his father, playing matchbox cars, and digging in dumpsters...
>
> SOCIAL FUNCTIONING: Mr. Naylor was friendly, and related well during the interview. Rapport was easy to establish and maintain during testing. Overall social functioning appears fair.
>
> CONCENTRATION:  Mr. Naylor exhibited a mildly impaired level of concentration, based on the Digit Span score of 6.
>
> PERSISTENCE:  He was persistent and required little encouragement.
>
> PACE:  He worked at a normal pace.
>
> CAPABILITY TO MANAGE BENEFITS:  Mr. Naylor appears competent to manage any benefits he may receive.

(Tr. at 265-66.)

On February 22, 2001, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant had "impairment(s) not severe" in the category of organic mental

19

disorder. (Tr. at 268.)   Claimant's disorder was found to be
"Borderline IQ."  (Tr. at 269.) Claimant had mild restriction of
activities of daily living, mild difficulties in maintaining social
functioning,  mild  difficulties  in  maintaining  concentration,
persistence or pace, and no episodes of decompensation.  (Tr. at
278.)    The  evidence  did  not  establish  the  presence  of  "C"
criteria.  (Tr. at 279.)  The evaluator, Rosemary L. Smith, Psy.D.,
noted: "18 year old claimant with 11 years of education.  He was in
Sp. Ed. [special education] classes.  No SGA [substantial gainful
activity].   Allegations - nervous, memory problems, MMR [mild
mental retardation].   No current MH [mental health] treatment...
Per "B" criteria, impairments not severe."  (Tr. at 280.)

On June 4, 2001, Patricia Babbitt, MATLSW Therapist, Shawnee
Hills, Inc., signed a Discharge Summary form indicating that
Claimant's diagnosis at time of discharge from the center was
attention deficit disorder with hyperactivity and borderline
intellectual functioning. (Tr. at 290.)  She further indicated:
"Billy continued to struggle academically.  He continued to need
medication for ADHD s/s [signs and symptoms].  Case is being closed
at this time.  If future services are needed, a comprehensive
psychiatric evaluation will be completed."  (Tr. at 290.)

On May 25, 2005, a State agency medical source provided a
Psychiatric  Review  Technique  form  and  opined  that  he  had
insufficient evidence to provide an opinion.  (Tr. at 570-83.)

Timothy Saar, Ph. D., the evaluator, stated that Claimant "did not keep the exam (appointment) nor did he respond to the CECO or a followup phone call." (Tr. at 582.)

On October 3, 2005, Joann B. Daley, M.A., Clinical Psychologist, provided a report of psychological evaluation. (Tr. at 584-87.) Ms. Daley found:

> INTELLECTUAL ASSESSMENT: Results of the WAIS-III are as follows:
>
> | IQ Scale | Score | Index | Score |
> |---|---|---|---|
> | Verbal IQ | 90 | Verbal Comprehension | 96 |
> | Performance IQ | 84 | Perceptual Organization | 93 |
> | Full Scale IQ | 87 ... | | |
>
> WAIS-III VALIDITY: IQ scores are valid because Billy was adequately motivated and worked with good persistence. Rapport was easily established and he seemed comfortable in the evaluation session. There was no indication of visual or hearing impairment and current scores are commensurate with previous test scores.
>
> ACHIEVEMENT: Results of the WRAT-3 are as follows:
>
> | Achievement Area | Standard Score | Grade Score |
> |---|---|---|
> | Reading | 88 | 8 |
> | Spelling | 65 | 3 |
> | Arithmetic | 68 | 4 |
>
> WRAT-3 VALIDITY: Although Spelling and Arithmetic are lower than those obtained in 1999, all three scores are considered to be valid because of his positive approach to evaluation tasks. Spelling and Arithmetic scores may be lower than previous scores because of being out of school and not using these skills.
>
> DIAGNOSIS:
>
> | Axis I | 315.9 | Learning Disorder NOS |
> |---|---|---|
> | Axis II | V71.09 | No Diagnosis |
> | Axis III | | None noted |
>
> DIAGNOSTIC RATIONALE: The diagnosis of Learning Disorder NOS is based on current discrepancy between ability and achievement scores in Math and Spelling.
> PROGNOSIS: Guarded.

(Tr. at 585-86.)

On November 17, 2005, Ernie Vecchio, M.A., a licensed psychologist, provided a Disability Determination Evaluation of Claimant for the West Virginia Disability Determination Service. (Tr. at 588-93.)  Mr. Vecchio found Claimant's thought process, perceptual, psychomotor behavior, judgment, immediate memory, recent memory, persistence, and social functioning during the evaluation to be within normal limits. (Tr. at 591-92.) He found Claimant's insight poor; remote memory and concentration moderately deficient; and pace mildly deficient. (Tr. at 591-92.)  Regarding Claimant's social functioning, he stated:

> The claimant reported that he completes the following activities on a daily basis with little to no assistance: cook, shopping, running errands, walking and engaging in hobbies (working on electronics, alien investigations and psychic abilities).  He reported that he completes household chores and sits on the porch or outside on a weekly basis.  He reported that he completes personal hygiene activities once per month.  He stated that he visits friends and relative approximately twice monthly....
>
> DIAGNOSES:
> AXIS I      315.9      Learning Disorder, NOS (by history)
>             309.4      Adjustment    Disorder    with    Mixed
>                        Disturbance of Emotions and Conduct
>                        (by history)
>             314.01     Attention        Deficit/Hyperactivity
>                        Disorder, Combined Type (by history)
> AXIS II    V62.89      Borderline Intellectual Functioning
>                        (by history)
>            R/O301.7    Antisocial Personality Disorder
> AXIS III   Chronic leg pain and weakness (by patient
>            report).
>
> DIAGNOSTIC RATIONALE:
> The diagnosis of Learning Disorder, NOS is assigned due
> to a previous diagnosis by Joann B. Daley...dated 11-03-
> 05.  Borderline Intellectual Functioning is assigned due

to a previous diagnosis, interaction with the examiner
and answers to psychosocial history questions.    The
diagnosis of Adjustment Disorder with Mixed Disturbance
of Emotions and Conduct is assigned based on a previous
diagnosis in 1996 and reported symptoms of both anxiety
and interaction with the legal system [detained by police
once while "dumpster digging"] as well as additional
behavior problems.    The R/O diagnosis of Antisocial
Personality Disorder is made based upon a history of
conduct problems beginning before the age of 18 and
continuing into adulthood as well as a previous diagnosis
of Conduct Disorder in 1996 at the age of 14.
<u>PROGNOSIS</u>: Poor.
<u>CAPABILITY</u>: The claimant is not capable of managing his
own finances.

(Tr. at 592-93.)

On January 6, 2006, a State agency medical source completed a

Mental Residual Functional Capacity Assessment and opined that

Claimant was not significantly limited in any of the areas of

"Understanding and Memory" or "Adaptation." (Tr. at 594-95.)    In

the category of "Sustained Concentration and Persistence," Claimant

was not significantly limited in the ability to carry out very

short and simple instructions, to carry out detailed instructions,

to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances, and to

make simple work-related decisions.    However, he was found to be

moderately limited in the ability to maintain attention and

concentration for extended periods, to sustain an ordinary routine

without special supervision, to work in coordination with or

proximity to others without being distracted by them, and to

complete a normal workday and workweek without interruptions from

23

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

In the area of "Social Interactions," Claimant was not significantly limited in the ability to interact appropriately with the general public, to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. However, he was found to be moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 594-95.)

The evaluator, Jeff Harlow, Ph.D., concluded: "While the claimant's mental disorders cause some limitations as denoted in Section II, the evidence in the file indicates that claimant can perform repetitive one and two step work-like activities on a sustained basis. Please see PRTF [Psychiatric Review Technique Form] for rationale." (Tr. at 596.)

On January 6, 2006, a State agency medical source provided a Psychiatric Review Technique form. (Tr. at 598-611.) Jeff Harlow, Ph.D., the evaluator, also provided the aforementioned Residual Functional Capacity Assessment. The categories upon which he based Claimant's mental disposition were organic mental disorders, affective disorders, and personality disorders. (Tr. at 598.) On the form, he checked that Claimant had "[p]sychotic features and

24

deterioration that are persistent (continuous or intermittent)" and listed: "ADHD [attention deficit hyperactivity disorder] LD [learning disability]." (Tr. at 600.)

Dr. Harlow found that Claimant's affective disorder was "[d]epressive syndrome characterized by... psychomotor agitation or retardation, or decreased energy, or feelings of guilt or worthlessness, or difficulty concentrating or thinking." (Tr. at 601.) He stated Claimant's personality disorder as "[i]nflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress evidenced by...pathological dependence, passivity, or aggressivity." (Tr. at 605.) He found Claimant had a mild degree of limitation in restriction of activities of daily living and in maintaining social functioning; a moderate degree of limitation in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 608.) Dr. Harlow found that the evidence does not establish the presence of the "C" criteria. (Tr. at 609.) In his analysis, he concluded:

> Claimant statements about functional capacities on the ADL [activities of daily living] form are fully credible as they are internally consistent and externally consistent with statements made at the consultative evaluation. Although this claimant's mental impairments show some limitations in specific capacities as denoted on the MRFC; it is concluded that the claimant can perform repetitive work-related activities because these limitations are moderately limited or less.

(Tr. at 610.)

25

On June 2, 2006, Sheila Emerson Kelly, M.A., provided a report of psychological evaluation of Claimant upon referral from his representative.  (Tr. at 615-21.)   Ms. Kelly observed in the Mental Status Examination section of her report:

> This is an average height, overweight, white male accompanied by his father.  He is wearing jeans and a black tee shirt and has long, rather shaggy, brown hair. He gives every impression of being mentally retarded.  He is extraordinarily naive and childlike and very open about his interpersonal problems.  Probably the best adjective to describe him would be "under socialized". He has a history of treatment for Attention Deficit Disorder.   He admits that he collects junk and electronics and enjoys "dumpster diving".  His social skills are relatively unusual in that he is friendly and pleasant but definitely inappropriate.
>
> He sleeps all day and is up all night.  "I eat about every four hours." He is an extremely poor informant and displays significant problems with memory including immediate recall.  His mood is "depressed because I don't have any money".  He states that if he had money he would "spend it on electronics, CD's, DVD's". When asked if he was suicidal, he indicated that he attempted to kill himself several years ago by choking himself with his hands.  "When I couldn't breath, I quit".  He states that he attempted suicide "because the Medicine Shop closed and I was afraid I'd never see Sam (the pharmacist) again".
>
> There is no evidence of any psychotic dysfunction and his speech is spontaneous, coherent, and relevant although he is as noted above inappropriate.  His range of affect is generally bright but frequently inappropriate to the content.

(Tr. at 618.)

Ms. Kelly administered the following tests to Claimant: Wechsler Adult Intelligence Scale-III (WAIS-III), Wide Range Achievement Test-III (WRAT-III), Minnesota Multiphasic Personality

26

Inventory-2 (MMPI-2), and a Clinical Interview. (Tr. at 615.) On the WAIS-III, Claimant's Full Scall IQ fell within the average range of intellectual ability. (Tr. at 619.) On the WRAT-III, he scored at a seventh grade level in reading and a fourth grade level in arithmetic. (Tr. at 619.) Ms. Kelly noted that his

> reading abilities are relatively stronger than his arithmetic abilities but both are well below what would be expected of an individual of average intellectual functioning. Nonetheless, he was able to complete a Minnesota Multiphasic Personality Inventory-2 and the profile was valid. Most clinical scales fell within the average range of functioning with the exception of significant elevations on scales 8 and 0. These are individuals who are very schizoid and avoidant. They spend a great deal of time in personal fantasy with little capacity to form meaningful interpersonal relationships...

> Mr. Naylor gives every impression of being mildly mentally retarded although he is certainly not. He has significant problems with interpersonal relationships, feeling that others are making fun of him (which is very well possible given his interpersonal presentation). He keeps very much to himself with the exception of his elderly friend and his parents and doesn't have anything in the way of an alternative social support network...

> Although Mr. Naylor appears to be mildly mentally retarded, he is in fact of average intellectual ability. His academic skills are not consistent with that level of intellectual functioning. He has some attention deficits which are demonstrated by impaired attention and concentration and poor immediate memory. This is an individual who is functionally developmentally delayed rather than intellectually developmentally delayed...
> Mr. Naylor has worked competitively only once, six days cleaning the Civic Center for Kelly Services. He resigned from that position when his supervisor accused him of "stinking and passing gas which embarrassed me like crazy". He tells me he avoids taking showers because he doesn't like the smell of the chlorine in the water. He is rather disheveled and odorous today.

27

My impression is that Mr. Naylor is extremely schizoid
and avoidant and if he becomes sufficiently distressed by
environmental or situational stressors, he will in all
likelihood decompensate into a psychotic state.  To my
knowledge, this has never occurred, but I have no medical
records.

Mr. Naylor is unlikely to be competent to manage his own
financial affairs should he be determined to be disabled.
A full neuropsychological evaluation is strongly
recommended, preferably by a neuropsychologist from CAMC,
in order to rule out some type of organic difficulty.

```
DIAGNOSTIC IMPRESSION:
Axis I     Rule Out Cognitive Disorder, NOS
AXIS II    Schizoid Personality Disorder with Dependent
           and Avoidant Characteristics
           Reading Disorder
           Math Disorder
AXIS III   Complaints of Back and Foot Pain of Unknown
           Etiology
```

(Tr. at 619-21.)

Ms. Kelly also provided a "Mental Impairment Questionnaire

(RFC & Listings)" form.  (Tr. at 623-29.)  She stated that her

length of contact with Claimant was "once for evaluation" and

identified his signs and symptoms were "poor memory difficulty

thinking or concentrating; oddities of thought; speech or behavior;

social withdrawal or isolation; blunt, flat or inappropriate

affect."  (Tr. at 623.)  She found Claimant's prognosis to be

"poor."  (Tr. at 624.)

On the form, Ms. Kelly indicated that Claimant was slightly

limited in the ability to remember work-like procedures, to

understand and remember very short and simply instructions, and to

carry out very short and simple instructions.  (Tr. at 626.) Ms.

28

Kelly marked that Claimant was limited in the ability to ask simple questions or request assistance, to respond appropriately to changes in a routine work setting, and to be aware. (Tr. at 627.) She found him to be moderately limited in the ability to understand and remember detailed instructions, to maintain attention for extended periods, to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination or proximity to others without being unduly distracted by them, to make simple work-related decisions, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. She indicated that Claimant was markedly limited in the ability to carry out detailed instructions. (Tr. at 626.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ posed an incorrect hypothetical question to the vocational expert (VE), (2) the ALJ failed to evaluate or consider a large amount of the evidence of record, (3) the ALJ's decision is arbitrary and capricious because it is not supported by substantial evidence for various reasons related to his evaluation of Claimant's functional

29

limitations.  (Pl.'s Br. at 19-36.)

The Commissioner argues that (1) the ALJ posed a correct hypothetical question to the VE; (2) the ALJ correctly considered and evaluated all of the evidence of record; and (3) the ALJ correctly evaluated Claimant's functional limitations, credibility, and severe impairments in the evaluation process.  (Def.'s Br. at 9-21.)

ALJ's Hypothetical Defective

Claimant argues that the ALJ decision was not based on substantial evidence because his hypothetical question posed to the vocational expert was defective.  He contends that the question was an incomplete description of the mental impairments, and generalized the residual functional capacity to simple repetitive tasks and minimal stress.  (Pl.'s Br. at 19-23.)  Specifically, Claimant asserts that the ALJ's limitation to simple, repetitive tasks involving minimum stress and minimal contact with the public did not accurately reflect the testimony of Dr. Linton, the medical consultant.  Claimant asserts that

> Dr. Linton's testimony was much more restrictive.  For
> instance, Dr. Linton testified that Naylor would need a
> "great deal of supervision."  (Tr. 687.)  Dr. Linton
> testified that it has to be a relative benign environment
> where people aren't yelling at him.  "It would have to be
> a relatively supportive work...environment." (Tr. 690.)
> Indeed, Linton testified it was "conceivable" that he
> would need a sheltered workshop.  *Id.*  Those limitations
> were not included in the ALJ's hypothetical.  Moreover,
> Dr. Linton testified that the vocational limitations of
> Naylor's inability to go outside unless someone is with
> him should be left to the vocational expert (VE).  (Tr.

30

688.)  The ALJ did not include that limitation in his
hypothetical to the VE.  Because of his mental condition,
Naylor does not drive.  The ALJ failed to include that
limitation.  Moreover, Dr. Linton didn't limit him to
minimal contact with the public; in his opinion, "he
couldn't work with the public." (Tr. 686.)  Dr. Linton
characterized his socialization level at 13 years of age.
(Tr. 691.)  When asked how many employers would tolerate
an adult to function as a thirteen year old?  Dr. Linton
again said he would defer to the VE as to whether that
limitation would preclude competitive employment.  "I
really don't know whether a person with that
developmental level would be able, what kind of jobs
would be available for a person like that." (Tr. 691-
692.)  Again, this limitation is absent from the ALJ's
hypothetical...

The record is also replete with evidence that Naylor
could not deal with authority--"couldn't stand being told
what to do" was oppositional and intrusive.  The ALJ did
not include these limitations in his hypothetical...

With respect to his mental impairments, the ALJ
generalized residual functional capacity-reference to
simple repetitive tasks and minimal stress is also
problematic.  An RFC assessment "must identify the
individual's functional limitations or restrictions and
assess his/her work related abilities on a function by
function basis, including the functions in paragraphs
(b), (c), and (d) of 20 C.F.R. §404.1545 and §416.945."
(SSR 96-8p)(Emphasis supplied). With respect to mental
abilities, the ALJ must consider, among other things,
"understanding, remembering, and carrying out
instructions...responding appropriately to supervision,
co-workers, and work pressures..." in addition to
"difficulty maintaining attention and concentration." 20
C.F.R. §§404.1545(c); 416.955(c)...

The ALJ's use of minimal stress in his hypothetical also
constitutes reversible error...In this case, the ALJ's
hypothetical...uses the term "minimal" stress without
defining it.  All jobs are stressful. From a common sense
standpoint, all jobs have more than minimal stress.
There may be low stress jobs in the marketplace but there
are no minimal stress jobs.

(Pl.'s Br. at 19-23.)

The Commissioner argues that the ALJ posed a correct hypothetical question to the vocational expert, stating:

> The ALJ fully considered and relied on Dr. Linton's testimony when he framed his hypothetical question to the vocational expert. Specifically, the ALJ asked the vocational expert to consider an individual of Plaintiff's vocational profile, who was limited to medium work that involved only simple, repetitive tasks, minimal stressful situations, and minimal contact with the public (Tr. 695). This hypothetical question was correct because it accurately reflected Plaintiff's limitations that were supported by the record... The ALJ's limitation to jobs involving only simple, repetitive tasks accommodated Plaintiff's learning disability and resulting deficits in memory and concentration. The ALJ's limitation to minimal contact with the public and minimal stressful situations accommodated Plaintiff's personality disorder and resulting deficits in social behavior...
>
> To the extent that Plaintiff suggests that a limitation to "simple, repetitive tasks" was not sufficient, he is mistaken because the ALJ's limitation was more expansive. This is, the ALJ limited Plaintiff to unskilled work that involved only simple, repetitive tasks, minimal stress, and minimal contact with the public (Tr. 20, Finding No. 4; 695). Moreover, the ALJ relied on the medical expert testimony of Dr. Linton to determine that an individual such as Plaintiff, with a learning disability and a personality disorder, could perform work involving simple, repetitive tasks, minimal contact with the public, and minimal stress. In fact, Dr. Linton testified that it was not Plaintiff's intellectual functioning as much as his social functioning that resulted in work-related limitations (Tr. 690-91). Based on this evidence, the ALJ correctly determined that Plaintiff could perform work involving simple, repetitive tasks.
>
> Plaintiff next contends that the ALJ's use of the terms "simple, repetitive tasks" and "minimal stress" in his residual functional capacity determination are incorrect (Pl.'s Br. at 21). He asserts that the ALJ should have assessed his abilities on a "function by function" basis. Plaintiff's argument is somewhat unclear and appears to be another way of alleging that the ALJ did not consider

all of his functional limitations.  As discussed above, and as the ALJ's decision shows, the ALJ considered all of the evidence and rendered a residual functional capacity determination in accordance with the regulations... That is, the ALJ considered Plaintiff's functional limitations related to his learning disorder and his personality disorder, including his moderate deficits in memory based on psychological and IQ testing, his limited social functioning documented in the record, his limited work history, his alleged difficulty with people of authority and tendency to respond with anger, among other characteristics, when determining that he could perform simple, repetitive, unskilled work with minimal stress and limited interaction with the public. This residual functional capacity determination is in full accordance with the regulations and correctly reflects Plaintiff's abilities based on the evidence.

(Def.'s Br. at 10-14.)

Claimant responded to the Commissioner's argument:

Plaintiff concedes that minimal stressful situations could reasonably take into account not being yelled at. However, there is no conceivable way that the ALJ's hypothetical of "...simple repetitive tasks, minimal stressful situations, and minimal contact with the public" accommodates, in Dr. Linton's view, Naylor's need of a "great deal of supervision" and his emotional age of 13.  Also, his hypothetical does not take into account Naylor's inability to go outside by himself and drive. Dr. Linton himself testified that he would defer to the vocational expert as to the vocational limitations of such restrictions.  Thus, the ALJ's failure to include these restrictions in his hypothetical constitutes reversible error.  The undersigned does not find it necessary to address the Commissioner's other arguments as they do not provide a significant defense of the ALJ's errors.

(Pl.'s Response Br. at 1.)

The ALJ found:

The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. At the supplemental hearing the ALJ asked the vocational expert whether jobs exist in the national economy for an

33

individual with the claimant's age, education, and work experience. The ALJ limited the hypothetical individual to medium exertion, but the remaining limitations given to the vocational expert were consistent with the claimant's residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations at the unskilled medium exertion level, such as cleaner/industrial (1,100,000 jobs existing nationally) and groundskeeper (162,000 jobs existing nationally). The ALJ finds that the claimant has no severe physical impairment and thus can perform the exertional demands of work at any level. This finding has no impact on the testimony of the vocational expert since the claimant's nonexertional limitations were also specified in the hypothetical and she identified the jobs listed above. Therefore, the claimant can perform the jobs identified by the vocational expert...

The claimant's representative asked the vocational expert if there would be jobs that an individual who had the limitations included in Exhibit 23F could perform. The vocational expert testified that there would be no jobs for such an individual. However, as discussed previously, the undersigned finds that there is no evidence to support such limitations.

The claimant's representative asked the vocational expert if there would be jobs that an individual who had the limitations included in Exhibit 20F could perform. The vocational expert testified that there would be no jobs for such an individual. However, as discussed previously, the undersigned finds that there is no evidence to support such limitations.

Finally it is noted that the claimant's representative asked the vocational expert if there would be jobs for an individual who experienced hyperactivity and distractibility at the moderate to severe level. The vocational expert testified that if this interfered with the individual's ability to perform job tasks, he could not sustain work. However, the undersigned finds that the evidence does not support such a limitation.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional

> capacity, the claimant is capable of making a successful
> adjustment to other work that exists in significant
> numbers in the national economy.  A finding of "not
> disabled" is therefore appropriate under the framework of
> section 204.00 in the Medical-Vocational Guidelines.

(Tr. at 24-25.)

The undersigned has thoroughly reviewed the record, including Dr. Linton's testimony and the hypothetical questions posed to the vocational expert (Tr. at 677-701).  Claimant asserts that Dr. Linton's testimony was more restrictive than the limitations that the ALJ included in the hypothetical question.  The undersigned finds this assertion to be incorrect as the ALJ fully considered Dr. Linton's testimony in posing hypothetical questions to the vocational expert, including the questions posed to Dr. Linton by Claimant's representative.  While true that Dr. Linton opined that Claimant could not work with the public (Tr. 686), the ALJ found that based on the evidence, including all of Dr. Linton's testimony, that Claimant need only be limited to work that required "minimal contact" with the public.  (Tr. at 695.)

Dr. Linton testified:

> Your honor, the problem that I have is that this is
> certainly an unusual situation, you know, in terms of his
> personality style.  He does not meet 1205C and I don't
> think the record would reflect that.  And I don't have
> anything that would suggest a listing level B Criteria.
> Certainly there would be substantial limitation on the
> types of jobs this young man could do in my estimation.
> And certainly I don't think he could work with the public
> and I don't think he could work in a high stress job.  I
> can't speak to his physical limitations so I don't know
> whether he can sit for a certain period of time or stand
> for a certain period of time.  I'm afraid I can't address

35

that. But, you know, the, the hunch all through the file
has been that 1205C or near, near it was probably likely
but the evidence suggests that it is not. And –

Q [ALJ]    I don't know how we could do that with, with
two IQ's in the 90's.

A      Exactly, yeah. So really, you know, Ms. Kelly
indicated that she thought that this young man was rather
schizoid. The Emmett [phonetic] guide wasn't really that
significant. The eight scale was just barely above so I
think the interpretation was a little more extensive than
the data suggested. He's very introverted by nature.
He's introverted, he is unique in many respects. He's
atypical. His social skills are unusual. He's an
uncomplicated fellow who lives a rather uncomplicated
life. So I think he would have to work in a, relatively
benign setting that provided a great deal of supervision
would be my, my estimate. I can't really say much more
than that. I don't see him meeting or equaling a listing
primarily because of the B Criteria. I don't have any
evidence that those would be met. And even the C
Criteria doesn't seem to be – I don't know what we would
put that on. He doesn't have depression. He doesn't
have substantial anxiety. He has situational based
society who lives in a dangerous neighborhood. I mean
there's no question that there's some reality to his
concerns about, you know, that is not a situation where
you go out at 10:00 at night by yourself and take a walk
around the neighborhood, you know. He would be putting
himself in harm's way probably to do that. So I don't
think that's unreasonable or, you know, significant
clinically that he would go out at 10:00 at night without
some, with another adult or something. So I really
don't, as much as I would like to, I just have a hard
time getting anything that would, that would meet or
equal a listing... He's not agoraphobic, there's no
question about that... he lives a relatively sheltered
life but yet the B Criteria suggest that he does an awful
lot on his own as well... certainly he doesn't drive and
his dad doesn't drive so getting to a place of employment
would have to be on public transportation I think.

Q [Claimant's representative]   What about his testimony
regarding he can't...take orders?

A      I hear that a lot and that's why I'm saying it has
to be a relatively benign environment where people aren't

36

yelling at him... I would think he'd have to be in a relatively supportive work type of environment.

Q [Claimant's representative] Well, I think that from what I've seen in the records it seems to me [INAUDIBLE] sheltered workshop type of situation.

A     Well, that's, that's conceivable but I don't know if that, I mean his, his intellectual functioning and his social facility is better than the average sheltered workshop person... He's immature there is no question about that...

Q [Claimant's representative] That would be very difficult then to, would it not then that he socializes in that way to function in an adult world type situation.

A     Well, it all depends. I mean I would defer to the VE about that. I know certainly at the hospital which, you know, we have thousands of employees at the hospital and many of them that I converse of, for example, they are buffing the floors and so forth are, are pretty, pretty limited. You know, they are interacting in a way that suggests they aren't terribly mature and they take the bus to work and I see them out at the bus stop waiting to go home. So I'm afraid that's out of my area. I really don't know whether a person with that development level would be able, what kind of jobs would be available for a person like that.

(Tr. at 686-92.)

The ALJ then posed hypothetical questions to the vocational expert, Cecilia Thomas, based on the record and Dr. Linton's testimony:

I'm going to ask you to assume a person age 23 with an 11th grade special education, education [sic]. Further assume I find the person capable of a range of medium work. I'm not going to limit the physical aspects of medium but I am going to box in the non extertional a little bit based on testimony we've had from Dr. Linton and some of the other evidence that we find in the file. So I'd ask you to be looking for jobs that would involve simple repetitive tasks or instructions, minimal contact with the public. And it would present minimal stressful

situations.  And I'd ask if there would be any positions available for such a person?


A     Well, if we look only at those parameters, Your Honor, I think that there would be jobs that we could consider.  Certainly some of the cleaning occupations, sweeping, or industrial type cleaning would be more in line rather than a position out in the regular open setting where public people are in.  If we looked at an industrial sweeper cleaner we're looking in that grouping of entry level jobs around 1,100,000 nationally... we might look at grounds keeping, landscaping positions... Nationally those number approximately 162,000.  And those would be examples of a couple of jobs that we might look at with just within these parameters.  Just simple entry level medium jobs...

Q (Claimant's Representative) If the hypothetical person had the limitations contained in 23F [INAUDIBLE] Kelly's report -

ALJ: Have you got that?... So this would be adding to the existing hypothetical?

VE: Right, right.  I feel that if a person has the limitations outlined by Ms. Kelly... I do believe that these limitations would prohibit a person from doing sustained work activity at any level...

Q (Claimant's Representative) If – what would be the impact, vocational impact with respect to the Judge's first hypothetical would be the fact that he does not drive?

A     Well, it would just really mean that the person would need to be able to take advantage of public transportation in order to get to work.

Q (Claimant's Representative) Suppose the person, with respect to the Judges first hypothetical, was – had moderately severe to severe problems with hyperactivity and [INAUDIBLE]?

A     Well, if those types of problems begin to real themselves within and interfere with a person, you know, on the job we might see a person that couldn't satisfactorily complete tasks or perform a job up to

38

standards for an employer.

Q (Claimant's Representative) And, finally, suppose a person's memory was moderately deficit what vocational impact would that have on the jobs that you named in the Judge's first hypothetical?

A    Well, again, if that became a problem in execution of job duties...we may see a situation that, that kind of problem would cause a person to lose a job.

Q (Claimant's Representative) I believe that's all I have, your Honor.

ALJ    Is memory the kind of job requirement you would normally associate with this kind of unskilled jobs?

A    Well, a person would need some degree of memory but not a high degree...

Claimant's Representative: Finally, just for the record, Your Honor, I need to object to...the first hypothetical on the basis that the Appeals Council has repeatedly said that the hypothetical needs to be a function by function restriction -

ALJ: Yes.

ATTY:  - and I don't believe that, that qualified.

ALJ:   And how would you interpret it to have been done better?  Function by function, what do you mean by that?

ATTY: Well, the type of functions that I, that are contained in 20F, 23F and contained in the Palms [phonetic] dealing with the different types of mental deficiencies, Your Honor.

(Tr. at 695-700.)

    To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 51

(4th Cir. 1989).  "[I]t is difficult to see how a vocational expert
can be of any assistance if he is not familiar with the particular
claimant's impairments and abilities -- presumably, he must study
the evidence of record to reach the necessary level of
familiarity." Id. at 51.  Nevertheless, while questions posed to
the vocational expert must fairly set out all of claimant's
impairments, the questions need only reflect those impairments that
are supported by the record.  See Chrupcala v. Heckler, 829 F.2d
1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question
may omit non-severe impairments, but must include those which the
ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292
(8th Cir. 1983).

        The court proposes that the presiding District Judge **FIND** that
the hypothetical question posed by the ALJ included those
limitations that were supported by substantial evidence of record.
The ALJ's residual functional capacity finding related to
Claimant's impairments reflected Claimant's limitations as
supported by substantial evidence of record.  These limitations
were included in a hypothetical question, and the vocational expert
concluded that Claimant could perform work.  As noted in the
Claimant's argument, Claimant's representative had an opportunity
to pose additional hypothetical questions to the vocational expert,
and did so.  (Tr. at 696-701.)  The record clearly shows that the
ALJ was present and participating in the re-examination of the

vocational expert.  (Tr. at 696-701.)

Failure to Consider Evidence

Claimant argues that the ALJ ignored the treatment and
evaluation records from Shawnee Hills Mental Health Center, LaRee
DeVee Naviaux, Ph.D., and Dr. Uy, and objects to the ALJ's
reference to other evidence prior to 2005, and should have more
carefully analyzed Claimant's school mental health records.
Specifically, Claimant asserts:

> These records are brimming with evidence of his inability
> to focus, pay attention, stay on task, and complete his
> work without special supervision and help.  They show
> changing medication because of ineffectiveness or side
> effects; they document bizarre, delusional, behavior and
> serious social isolation and withdrawal, inability to get
> along with his peers, oppositional and intrusive
> behavior, hyperactivity, distractibility, and obsessive
> compulsive traits.  The records show that he had weird
> ideas about bathing and was so neglectful of his personal
> hygiene that he was frequently noted to have body odor...
>
> Perhaps most importantly, the ALJ's (sic) references
> records remotely prior to 2005 to find Naylor was not
> disabled, including his hospitalization in Highland
> Hospital in March of 1991, the 2001 records from Family
> Medicine Center, and Tate's January 31, 2001 evaluation.
> The ALJ can't have it both ways.  He can't rely on remote
> evidence and psychological evaluations to find Naylor not
> disabled and ignore other evidence and psychological
> evaluations that support his disability.
>
> Finally, there was no evidence that Naylor's condition
> has improved to any significant degree.  Thus, his
> behavior, difficulties and functional impairments in a
> highly structured setting is strong evidence that he
> would not be able to function adequately in a relatively
> unstructured environment of competitive work.  Indeed,
> the fact that Naylor was not being treated after he left
> school made it all the more important for the ALJ to
> carefully analyze his school mental health records to
> obtain a picture of how he would likely behave as an

adult.  More importantly, the ALJ needed to compare his
adult behavior to his behavior as a student to see if his
adult behavior mirrored his past behavior.   There was
substantial evidence in the record showing that it did.

(Pl.'s Br. at 24-27.)

The Commissioner argues that the ALJ correctly considered and
evaluated all of the evidence of record, including the records from
Shawnee Hills Mental Health Center (Tr. at 18).   (Def.'s Br. at
14.)   The Commissioner further asserts:

Although the ALJ considered all of the evidence in
evaluating Plaintiff's claim, he need not have documented
every progress noted and medical report.   There is no
requirement in the law or regulations that the ALJ
discuss in the decision every piece of relevant evidence.
Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).
Here the medical evidence identified is neither the most
probative of Plaintiff's impairments nor relevant to the
time period of his claim.   For example, Dr. Naviaux's
single evaluation of Plaintiff at age seven was
incomplete and therefore less reliable than the three IQ
test results which the ALJ discussed in his decision (Tr.
211, 264, 585, 619).   Dr. Uy's progress notes document
routine medical care prior to 2005 and provide no
evidence regarding his Plaintiff's mental impairments;
the subject of his disability claim.

Plaintiff objects to the ALJ's reference to other
evidence prior to 2005, including a hospitalization in
Highland Hospital in 1991, medical records from Family
Medicine Center in 2001, and Ms. Tate's 2001 evaluation
(Pl.'s Br. at 26).   There is no evidence, however, that
the ALJ unduly relied on this evidence.   Rather, he
considered it in the context of all of the evidence in
assessing Plaintiff's medically documented impairments.

Finally, there is no merit to Plaintiff's related
argument that the ALJ should have more carefully
evaluated his school records to determine how he would
behave as an adult (Pl.'s Br. at 26).   The ALJ considered
all of the evidence, including Plaintiff's school
records, and made particular note of his IQ test results
(Tr. 17-18).   To the extent that the IQ test results

42

demonstrated    Plaintiff's    social    and    behavioral
functioning,  the  ALJ  considered  them  as  evidence  of
Plaintiff's  condition  at  that  time,  but  correctly
considered  more  recent  psychological  evaluations  to
assess Plaintiff's functioning as an adult.

(Def.'s Br. at 15-16.)

The ALJ wrote a very detailed eleven-page Decision.  (Tr. at

15-25.)   Contrary to Claimant's assertions, the ALJ did not ignore

the records from Shawnee Hills Mental Health Center and carefully

analyzed his school mental health records. The ALJ stated:

> Concerning the claimant's intellectual functioning the
> evidence includes a report of psychological evaluation
> from Kanawha County Schools dated October 4, 1990.  The
> report reveals that the claimant obtained a verbal IQ of
> 81, performance IQ of 87, and full scale IQ of 83.   It
> was noted that the claimant's performance fell in the low
> normal  range  of  intellectual  ability  (Exhibit 3F).   On
> November 23, 1993, a report from Kanawha County Schools
> indicates  the  claimant  obtained  a  verbal  IQ  of  67,
> performance IQ of 80, and full scale IQ of 71 (Exhibit
> 6F).   However,  on  May  28,  1996,  a  report  from  Kanawha
> County Schools reveals the claimant obtained a verbal IQ
> of  75,  performance  IQ  of  80,  and  full  scale  IQ  of  76
> (Exhibit 7F).
>
> The  claimant  underwent  a  consultative  psychological
> evaluation by Lisa C. Tate, M.A., on January 31, 2001.
> On the WAIS-III the claimant obtained a verbal IQ of 75,
> performance IQ of 76, and full scale IQ of 74.  The WRAT-
> 3  testing  indicated  that  the  claimant  could  read  and
> perform arithmetic at the fifth grade and spell at the
> second grade level.  Ms. Tate opined that the claimant's
> scores were valid.  She diagnosed phonological disorder
> and borderline intellectual functioning (Exhibit 13F).
>
> The  evidence  includes  treatment  records  covering  the
> period of September 7, 1996, to June 4, 2001, from
> Shawnee Hills.  A discharge summary dated June 4, 2001,
> reveals  that  the  claimant  was  discharged  because  he
> refused further service.  The summary indicated that the
> claimant  had  diagnoses  of  borderline  intellectual
> functioning and attention deficit hyperactivity disorder

43

(Exhibit 16F).

(Tr. at 17-18.)

The undersigned has reviewed all of the records from Shawnee Hills Community Mental Health/Mental Retardation Center, Inc. These treatment notes cover the period from September 7, 1996 to June 4, 2001. (Tr. at 290-569.) As noted by the ALJ, these records primarily document Claimant's treatment for attention deficit hyperactivity disorder, which caused him to struggle academically and to need medication for his disorder.

While the ALJ did not discuss the records of Dr. Naviaux and Dr. Dy, the undersigned has reviewed these records. These records include Dr. Naviaux letters to Dr. Uy dated July 23, 1990 and January 9, 1991 with attached IQ tests revealing that her single evaluation of Claimant was incomplete, and her July 16, 1990 and May 10, 1991 letters to Claimant's parents. (Tr. at 207-11.)  Dr. Uy's records are progress notes which document routine medical care from October 2, 1989 to May 22, 1998, and provide no evidence regarding Claimant's mental impairments, save his reference to Claimant's treatment by Dr. Naviaux and a statement that a "copy of records released to Bradley [sic, Braley] & Thompson." (Tr. at 223-49, 238, 240-41.)  Clearly these records do not enhance Claimant's case for social security benefits and the ALJ's failure to discuss them is inconsequential in light of the ALJ's exhaustive discussion of Claimant's other records relating to his

44

psychological condition.

The undersigned proposes that the presiding District Judge **FIND** that the ALJ did consider the "record as a whole" and did not discuss only selective evidence negative to Claimant, nor did the ALJ give more weight to certain evidence without stating any reason why it is more credible. Raney v. Barnhart, 396 F.3d 1007, 1009 (8th Cir. 2005) ("[Judicial] review of a decision of the Commissioner . . . in a disability benefits case is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole."). While not required to discuss every piece of evidence, an ALJ should discuss evidence that, if believed, could lead to a finding of disability. Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004); 20 C.F.R. § 404.1523 (2005); Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003) (per curiam); Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (Determination of whether substantial evidence supports decision in social security disability case requires reviewing court to consider not only evidence in the record that supports Commissioner's determination, but also any evidence that detracts from that conclusion).

Arbitrary and Capricious

Claimant next argues that the ALJ's conclusions about Claimant's limitations are "either arbitrary, unreasonably selective, or both." First, Claimant asserts that the ALJ did not

45

correctly evaluate Claimant's functional limitations according to paragraph B criteria of the listing of impairments for mental disorders. (Pl.'s Br. at 27-31.) Specifically, Claimant asserts that

> the ALJ concluded that there was no restrictions in Naylor's activities of daily living on the ground that he "spends the majority of his time either 'dumpster diving' or 'junking.'" (Tr. at 18) ... The ALJ's conclusion that Naylor had no restrictions in his daily activities is nonsensical. Keep in mind we are not talking about physical restrictions. How does scouring in dumpsters and picking up junk demonstrate that Naylor was capable of a full range of *normal* daily activities? The evidence establishes that he was not... (and that his) more extensive daily activities... included "alien investigations" and "psychic abilities." (Tr. 592).

(Pl.'s Br. at 27-28.)

Additionally, he states that he "has weird ideas and exhibited deviant behavior including a phobia of bathing which gave him a persistent body odor." (Pl.'s Br. at 30.) Claimant further asserts that the ALJ overstated Claimant's ability to cook, do chores, and socially interact. (Pl.'s Br. at 29-30.) He concludes that it is significant that he "had a highly supportive and structured setting at school, yet still exhibited serious problems in concentration, memory, and pace." (Pl.'s Br. at 31.)

The Commissioner argues that substantial evidence supports the ALJ's paragraph B criteria findings:

> For example, the ALJ's finding that Plaintiff had no restriction in activities of daily living is supported by evidence that he spends his days "dumpster diving" (Tr. 590), and watching television (Tr. 266); and he was able to live independently although he chose not to for

financial reasons (Tr. 615). Although Plaintiff asserts
that his daily activities were limited, in 2005 he
admitted to Mr. Vecchio that he was able to cook, shop,
run errands, walk, and engage in hobbies on a daily basis
(Tr. 592)... The ALJ's finding that Plaintiff had
"moderate" limitations in social functioning is supported
by evidence that he was polite and cooperative in his
evaluations (Tr. 584); that he visited friends and
relatives monthly (Tr. 592); and that he spent his days
with a friend, albeit one who was older than he (Tr.
617). Consistent with this evidence, Ms. Tate concluded
that he was friendly and related well, and that his
overall social functioning was "fair" (Tr. 266).
Finally, the ALJ's finding that Plaintiff had "moderate"
difficulties in concentration, persistence or pace is
supported by Ms. Tate's assessment that he had "mildly"
impaired concentration (Tr. 263), and Mr. Vecchio's
assessment that his concentration was moderately
deficient (Tr. 591-92).

(Def.'s Br. at 17-18.)

The ALJ found that Claimant does not have an impairment or

combination of impairments that meets or medically equals one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1

(20 CFR 416.920(d), 416.925 and 416.926). Specifically, the ALJ

stated:

The undersigned gives great weight to the testimony of
Dr. Linton, the medical expert, that the claimant has no
condition that meets or equals a listing. The claimant's
learning disability is evaluated under Section 12.02 and
his personality is evaluated under Section 12.08 of the
Listing of Impairments. Concerning the "Part B" criteria
the claimant has no restrictions of activities of daily
living. The claimant reported that he spends the
majority of his time either "dumpster diving" or
"junking" (Exhibit 23F). He also acknowledged that on a
daily basis he cooked and completed household chores.
The claimant noted that he engaged in a hobby of working
on electronics (Exhibit 19F). He has moderate
difficulties in maintaining social functioning. Dr.
Linton testified that the claimant is introverted.
However, the claimant does report that he visits friends

47

and relatives.  In fact, the claimant indicated that he spends a considerable amount of time with one friend in his apartment building.  The claimant has moderate difficulties in maintaining concentration, persistence or pace.  He has a history of special education classes with a learning disability in reading and math.  However, the evaluations of record reveal the claimant has only moderate limitation in concentration and in fact is of average intellectual ability.  There is no evidence that the claimant has experienced an episode of decompensation since he filed his application for supplemental security income.  Furthermore, the undersigned finds that there is no evidence of the presence of the "Part C" criteria.

(Tr. at 19-20.)

In evaluating the "B" criteria, the ALJ concluded that Claimant had "no" restrictions in activities of daily living, "moderate" restrictions in social functioning and concentration, persistence and pace and "no" episodes of decompensation, thus leading to a finding that Claimant's mental impairments (learning disability and personality disorder) are severe.  See 20 C.F.R. § 416.920a(d)(1)(A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.).  Here, the ALJ determined Claimant had a rating of "none" or "moderate" in the first three areas, and a rating of "none" in the fourth area. Considering all of the evidence of record, the ALJ determined that this lead to a conclusion that Claimant's impairments are severe.

The court proposes that the presiding District Judge **FIND** that the ALJ's correctly evaluated Claimant's functional limitations

48

according to the paragraph B criteria of the listing of impairments for mental disorders.    The ALJ's findings are supported by substantial evidence, and the court proposes that the presiding District Judge so find.

Next, Claimant claims that the ALJ's decision is not supported by substantial evidence because the ALJ's evaluation of Claimant's credibility was capricious. (Pl.'s Br. at 31-32.) Claimant alleges that the ALJ

> denotes a considerable amount of his credibility determination analyzing psychological reports and finding the ones in Naylor's favor not supported by the objective evidence.    In other words, the ALJ conflates the evaluation of medical opinions with determining credibility.  With respect to the factors he is supposed to consider, the ALJ ignores Naylor's daily activities, the location, duration, frequency, and intensity of his symptoms, factors that precipitated and aggravate the symptoms, and measures other than treatment to relieve his symptoms... The ALJ does consider lack of treatment and medication but, as pointed out below, does not consider possible reasons for this deficiency as required by SSR 96-7p.  Certainly his reported statements of not wanting to work and needing the money are legitimate considerations but considering the evidence of Naylor's bizarre thinking, their significance with respect to Naylor's credibility is problematic.

(Pl.'s Br. at 31-32.)

The Commissioner argues that the ALJ's determination that Claimant's learning disorder and personality disorder would not render him disabled from a range of simple, repetitive, unskilled work is supported by substantial evidence and that the ALJ properly evaluated Claimant's credibility in accordance with the regulations at 20 C.F.R. § 416.929:

49

In evaluating the intensity and persistence of his symptoms, the ALJ considered Plaintiff's testimony regarding his grade school experience, his inability to find work, his daily activities, and his sleep schedule (Tr. 21). The ALJ considered Plaintiff's alleged limitations and difficulties in the context of the medical evidence (Tr. 21-23). The ALJ noted that Plaintiff had told his doctors that he was seeking disability benefits because he did not want to work (Tr. 21, 256). Ultimately, based on all of the evidence, the ALJ determined that Plaintiff's allegations of total disability were not entirely credible (Tr. 21). Credibility determinations as to a claimant's testimony regarding her [sic, his] pain and limitations are for the ALJ to make. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions is to be given great weight." Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).

(Def.'s Br. at 19.)

The ALJ considered the evidence of record and found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. The ALJ stated:

The claimant filed his application for supplemental security income on February 16, 2005, but alleges disability since October 22, 1982, his date of birth. The objective findings of record reveals that the claimant's extreme allegations are not supported and he is not fully credible.

The evidence does indicate that the claimant has a history of one hospitalization at Highland Hospital on March 27, 1991, at age eight, due to reported behavioral difficulties.... The evidence of record supports the severe impairments of learning disability and personality disorder, but also is consistent with the finding that the claimant does not have mild mental retardation or

even borderline intellectual functioning. The undersigned gives great weight to the testimony of Dr. Linton, the medical expert, as it is well supported by the objective findings of record, including recent IQ scores.

Dr. DeTemple and Dr. Ashley at Family Medicine Center of Charleston indicated on January 19, 2001, that they were writing a letter at the request of the claimant who was seeking life long disability related benefits under the social security act. They further noted that the claimant requested the letter in support of his claim. However, Dr. DeTemple and Dr. Ashley indicated that the claimant reported he wanted disability benefits because "I don't want to work". In fact, the physicians indicated that the claimant had been examined thoroughly and had no physical limitations (Exhibit 12F, p1). This record supports the opinion that the claimant is not credible in that he reported to his physicians that he wanted disability because he did not want to work. The claimant did not indicate to his doctors that he was disabled, but instead acknowledged that he did not want to work. The claimant's acknowledgment of not wanting to work brings all of his allegations into question as apparently he is seeking benefits to avoid employment.

During a consultative evaluation on January 31, 2001, the claimant reported to Ms. Tate that he had no recent illnesses and was not taking any prescribed medication...This evaluation by Ms. Tate, which is after the alleged onset date but prior to the current application date of February 16, 2005, reveals that the claimant was not taking any medication and was functioning well.

During the consultative evaluation by Mr. Vecchio and Mr. Harris on November 17, 2005, the claimant reported that he was applying for benefits because in a way he needed the money. The claimant further indicated that his mother and father could not afford him and there were no jobs. He also reported that he took no medication with the exception of an aspirin on a PRN basis. Mr. Vecchio and Mr. Harris did opine that the claimant had moderately deficient remote memory and concentration. However, they found that the claimant's social functioning, judgment, immediate memory, recent memory were within normal limits (Exhibit 19F). The findings in this evaluation again indicate that the claimant is applying for benefits for

>monetary gain and not because he is disabled.  In fact,
>the claimant acknowledged that he was taking no
>medication other than aspirin.

(Tr. at 21-22.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

>- The medical signs and laboratory findings;

>- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

>- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to

work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

The court proposes that the presiding District Judge **FIND** that the ALJ's credibility findings are consistent with the applicable regulations, case law and social security ruling ("SSR") and are supported by substantial evidence.  20 C.F.R. § 416.929(b) (2007); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).  The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's physical and psychological treatment - including Claimant's complete lack of physical limitations and lack of medication, and his broad range of self-reported daily activities.  (Tr. at 23.)

Finally, Claimant contends that the ALJ did not correctly determine his severe impairments at step two of the sequential evaluation process.  (Pl.'s Br. at 32-36.)  Specifically, Claimant asserts that the ALJ was arbitrary in that he:

> rejects several diagnoses of mental impairments as severe impairments because Naylor was not under treatment but finds his personality disorder a severe impairment even though Naylor was also not being treated for this condition.  Moreover, the ALJ failed to solicit a diagnosis from Dr. Linton but arbitrarily selects personality disorder as Naylor's one severe impairment despite numerous other diagnoses in the record.  In addition, two psychologists diagnosed Personality Disorders.  However, Harris diagnosed an Anti-Social Personality Disorder while Kelly diagnosed a Schizoid Personality Disorder with Dependent and Avoidant

53

> Characteristics.    The  ALJ  fails  to  indicate  which
> personality disorder he adopted.  However, the nature of
> Naylor's Personality Disorder is critical to determining
> credibility... The ALJ's determination of severity was
> also selective and capricious.

(Pl.'s Br. at 32-33.)

> Claimant goes on to state that the

> ALJ rejected the diagnoses of Adjustment Disorder with
> mixed disturbance of emotions and conduct and Attention
> Deficit Hyperactivity Disorder as severe impairments.  On
> the grounds that he was 'currently taking no medication
> or undergoing any treatment.' (Tr. 19).  The irony, of
> course, is that the ALJ found Naylor's Personality
> Disorder a severe impairment despite the fact he was not
> getting any medical treatment nor taking any medication
> of this condition.  Nevertheless, in the absence of any
> inquiry by the ALJ as to whey (sic) he was not being
> treated, the ALJ's decision cannot stand...(per) SSR 96-
> 7p...

(Pl.'s Br. at 34-35.)

The  Commissioner  argues  that  the  ALJ  correctly  determined

Claimant's  severe  impairments  at  step  two  of  the  sequential

evaluation process stating:

> Plaintiff    appears    to    disagree    with    the    ALJ's
> determination that he had a severe impairment in the form
> of a personality disorder because, in his view, the ALJ
> did  not  distinguish  between  anti-social  personality
> disorder, as diagnosed by Mr. Harris, and a schizoid
> personality disorder, as diagnosed by Ms. Kelly.  In this
> argument,  Plaintiff  makes  much  of  a  diagnostic
> distinction which, ultimately, does not affect the ALJ's
> evaluation  of  his  claim.    The  ALJ's  use  of  a  broad
> diagnostic term for personality disorder rather than a
> more specified term encompasses all types of personality
> disorders.    Moreover,  the  ALJ's  use  of  the  term
> "personality disorder" is appropriate in the context of
> evaluating  Plaintiff's  claim  because  it  directly
> corresponds to the diagnosis as it is referenced in §
> 12.08 of the Listing of Impairments.  20 C.F.R. pt. 404,
> Subpt. P, app. 1, § 12.08.  Similarly, there is no merit

to Plaintiff's suggestion that the ALJ should have found his adjustment disorder or ADHD to be severe impairments (Pl.'s Br. at 34). As discussed above, these diagnoses pre-dated Plaintiff's claim.

(Def.'s Br. at 19-20.)

The ALJ made these findings in reaching his conclusion that claimant had the severe impairments of learning disability and personality disorder per 20 C.F.R. 416.920(c):

The claimant underwent a consultative psychological evaluation by Lisa C. Tate, M.A., on January 31, 2001... She diagnosed phonological disorder and borderline intellectual functioning (Exhibit 13F).

The evidence includes treatment records covering the period of September 7, 1996 to June 4, 2001, from Shawnee Hills...indicated that the claimant had diagnoses of borderline intellectual functioning and attention deficit hyperactivity disorder (Exhibit 16F).

The claimant underwent a consultative psychological evaluation by Joann B. Daley, M.A., on October 3, 2005...She diagnosed learning disorder, not otherwise specified (Exhibit 18F)...

The claimant underwent a consultative mental status examination by Ernie Vecchio, M.A., and Gregory G. Harris, M.A., on November 17, 2005. Mr. Vecchio and Mr. Harris indicated the claimant had diagnoses of learning disorder, not otherwise specified (by history); adjustment disorder with mixed disturbance of emotions and conduct (by history); attention deficit hyperactivity disorder combined type (by history); borderline intellectual functioning (by history); and antisocial personality disorder (Exhibit 19F).

The claimant's representative referred the claimant to Sheila E. Kelly, M.A., for psychological evaluation on June 2, 2006... Ms. Kelly diagnosed rule out cognitive disorder, not otherwise specified; schizoid personality disorder with dependant and avoidant characteristics; reading disorder; and math disorder (Exhibit 23F)...

John Linton, Ph.D., testified at the supplemental hearing

55

on December 11, 2006, that the claimant does not have a
psychological condition that meets or equals a listing.
Dr. Linton noted that recent IQ tests reveals that
claimant obtained scores in the 90's.  He opined that the
claimant is very introverted and unique in many respects.
Dr. Linton noted that the claimant leads an uncomplicated
life.  He opined that the claimant's work environment
should be very low key and quiet.

Therefore based on the evidence the undersigned finds
that the claimant has the severe impairments of learning
disability and personality disorder.  As noted by Dr.
Linton the claimant has evidence of IQ scores in the
90's, which does not support a diagnosis of mild mental
retardation or even borderline intellectual functioning.
In fact, even Ms. Kelly who evaluated the claimant at the
request of the claimant's representative, found he did
not have a low IQ or reduced intellectual functioning.
However, the claimant does have achievement test scores
consistent with a learning disability involving reading
and math.  Furthermore, as noted by the testimony of Dr.
Linton the claimant has an introverted and "unique"
personality.  The undersigned finds that the evidence
also supports the severe impairment of personality
disorder.

The records from Shawnee Hills indicate that the claimant
had a diagnosis of attention deficit hyperactivity
disorder, but refused further treatment and was
discharged on June 4, 2001.  Mr. Vecchio and Mr. Harris
indicated that the claimant had history of adjustment
disorder with mixed disturbance of emotions and conduct
and attention deficit hyperactivity disorder combined
type.  The undersigned notes that the claimant may have
history of these impairments, but is currently taking no
medication or undergoing any treatment.  Therefore, based
on the evidence of record the undersigned finds that
adjustment disorder and attention deficit hyperactivity
disorder are not severe impairments.

(Tr. at 18-19.)

The court proposes that the presiding District Judge **FIND** that

the ALJ did not arbitrarily determine Claimant's severe impairments

at step two of the sequential evaluation process.  The ALJ's use of

the term "personality disorder" is appropriate in the context of evaluating the claim because it directly corresponds to the diagnosis as it is referenced in § 12.08 of the Listing of Impairments.   20 C.F.R. pt. 404, Subpt. P, app. 1, § 12.08. Additionally, there is no merit to Claimant's assertion that the ALJ erred in not finding Adjustment Disorder and Attention Deficit Hyperactivity Disorder to be severe impairments.   The ALJ discussed Claimant's past treatment for the disorders and properly noted that Claimant was not taking medications or undergoing treatment for any of these conditions.   (Tr. 19.)   It is also significant that these diagnoses predated Claimant's claim.   Therefore, it was not necessary for the ALJ to inquire as to why Claimant was not being treated for the disorders.

<u>Conclusion</u>

After a careful consideration of the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that the Commissioner's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief Judge.   Pursuant to the

provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  January 27, 2010  
        Date

                                    _Mary E. Stanley_
                                    Mary E. Stanley
                                    United States Magistrate Judge